[No. 24784. *En Banc.* November 3, 1933.]

THE STATE OF WASHINGTON, *on the Relation of George W. Draham, Plaintiff,* v. CLIFF YELLE, *as State Auditor, Respondent.*[1]

*Yantis & Brodie,* for relator.

*The Attorney General, J. H. Secrest* and *George Downer, Assistants,* for respondent.

MILLARD, J.—This is an original application in this court for a writ of mandate requiring the state auditor to issue a warrant on the state treasury in favor of the treasurer of Thurston county, in payment of a voucher for expenses incurred by the Thurston county welfare board for administration and for direct relief furnished

[1] Reported in 26 P. (2d) 622.

pursuant to the provisions of chapters 8 and 65, Laws of 1933, such warrant to be

" . . . drawn on the State Emergency Relief Fund created by § 31, chapter 8, Laws 1933, p. 118 [Rem. 1933 Sup., § 9992-31], and funds provided therefor by chapter 65, Laws 1933, p. 336, from moneys appropriated by the 1933 legislature of the state of Washington for the purposes of the State Emergency Relief Administration."

The state auditor resists the application on the ground that no part of the appropriation made by § 3, chapter 65, Laws of 1933, p. 331, Rem. 1933 Sup., § 9992-37, reading as follows:

"The moneys arising from the sale of each issue of bonds under this act shall be deposited in the state treasury to the credit of the special fund created by section 31 of chapter 8, Laws of 1933, known as the 'State Emergency Relief Fund,' and shall be used to carry out the purposes and provisions of said act. For the purpose of paying expenses incurred under and carrying out the purposes and provisions of said act, there is hereby appropriated from the state emergency relief fund for construction work for unemployment relief the sum of ten million dollars ($10,000,000.00) or so much thereof as shall be necessary;"

may be expended for shelter, fuel, food, clothing, etc., included under the head of "home relief;" that is, in view of the language "for construction work for unemployment relief," the proceeds of the ten million dollar emergency relief bond issue (chapter 65, Laws 1933) may not be expended for any purpose other than "work relief."

The state emergency relief administration was created and its duties defined by chapter 8, Laws of 1933, p. 103, Rem. 1933 Sup., § 9992-1 *et seq.*, which was enacted for the purpose of relieving the people of the state from hardships and suffering caused by

unemployment. The reasons for the enactment are recited in § 1, as follows:

"The public health, peace and safety of the state and of each county, city and town therein being imperiled by the existing and threatened deprivation of a considerable number of their inhabitants of the necessaries of life, owing to the present economic depression, such condition is hereby declared to be a matter of public concern, state and local, and the correction thereof to be a state, county, city and town purpose, the consummation of which requires, as a necessary incident, the furnishing of public aid to individuals. While the duty of providing aid for those in need or unemployed because of lack of employment is primarily an obligation of the counties, nevertheless, it is the finding of the state that in the existing emergency the relief and assistance provided for by this act are vitally necessary to supplement the relief work accomplished or to be accomplished locally and to encourage and stimulate local effort in the same direction. This act, therefore, is declared to be a measure for the public health and safety and occasioned by an existing emergency. The provisions of any general, special or local law which are inconsistent with the provisions of this act or which limit or forbid the furnishing of shelter, fuel, clothing, water, light, medicine and medical attendance to persons other than poor persons shall not apply to the relief authorized by this act." Rem. 1933 Sup., § 9992-1.

The act provides for the creation of a county welfare board which shall represent the state emergency relief administration and the county in providing home relief and in administering the provisions of the act. The administration is authorized, by § 8 of the act, p. 110, Rem. 1933 Sup., § 9992-8, to make grants to county welfare boards for the prosecution of relief work. Section 10, p. 111, Rem. 1933 Sup., § 9992-10, provides that a county shall not receive state aid for home and/or work relief until a county welfare board shall be established.

Before granting home and/or work relief, investigation shall be made by the welfare commissioner of the need therefor and

"The amount of relief shall be determined on a budgetary basis which takes into account both the needs and resources of the applicant and his dependents. In each county applicants for relief shall be registered in a central index or registration bureau." (Laws of 1933, p. 112, § 12, Rem. 1933 Sup., § 9992-12).

The provision respecting state aid for work and/or home relief reads as follows:

"The administration may determine in its discretion from time to time the apportionment of funds as between work relief and home relief. Payment by the state to a county welfare board or county under this act shall not exceed fifty per centum of the amount of expenditures for such home relief and/or work relief as is approved by the administration during the emergency period. As a condition to the receiving of such grant of aid for home relief the county shall appropriate and make available to such board moneys equal to at least fifty per centum of its requirements. Payments by the state to a city or county under this act for work relief shall not exceed fifty per centum of the said expenditures. The administration may in addition, with the approval of the governor, make direct grants to a county welfare board for home relief and/or work relief and to a county or city for work relief on such conditions as it may prescribe. All moneys paid to persons receiving the relief provided by and pursuant to this act shall be inalienable by an assignment or transfer and shall be exempt from levy and execution under the laws of this state." Laws of 1933, p. 113, § 15, Rem. 1933 Sup., § 9992-15.

Section 2, p. 104, defines "work relief," "home relief" and "state aid" as follows:

" 'Work relief' means wages paid by a municipal corporation to persons, who are unemployed or whose employment is inadequate to provide the necessaries

of life, and/or their dependents, from money specifically appropriated or contributed for that purpose during the emergency period, for the performance of services or labor connected with work undertaken by such corporation independent of work under a contract or for which an annual appropriation has been made.

" 'Home relief' means shelter, fuel, food, clothing, water, light, necessary household supplies, medicine, medical supplies and medical attendance furnished to persons or their dependents in their abode or habitation whenever possible and does not include relief to veterans under existing laws, old age relief or allowances made to mothers for the care of dependent children or hospital or institutional care. . . .

" 'State aid' means payments to a county welfare board by the state for work relief and/or home relief or to a county or city for work relief furnished during the emergency period in accordance with the provisions of this act." Rem. 1933 Sup., § 9992-2.

Section 28, p. 117, Rem. 1933 Sup., § 9992-28, provides that the act shall be liberally construed to the end that the work of the administration shall be consummated as equitably and expeditiously as practicable. Section 31, p. 118, creates a special fund to be known as the state emergency relief fund, to which fund is appropriated twenty thousand dollars. That section reads as follows:

"For the purpose of carrying out the provisions of this act there is hereby created a special fund to be known as the state emergency relief fund, and there is hereby appropriated to this special fund from the general fund out of any moneys not otherwise appropriated the sum of twenty thousand dollars ($20,000.00) or so much thereof as shall be necessary." Rem. 1933 Sup., § 9992-31.

Chapter 8, Laws of 1933, p. 103, provided the machinery through which to afford relief (work relief and/or home relief) to the unemployed people of this state. No provision was made to make the plan ef-

fective. It is patent that the appropriation of twenty thousand dollars would be sufficient for payment of only a portion of the costs of administration during the formative period. The bond act, chapter 65, Laws of 1933, p. 336, was enacted to provide the funds to effectuate the declared purpose (relieve, by work and/or home relief, the people of the state from hardships and suffering caused by unemployment) of the relief act, chapter 8, Laws of 1933, p. 103. The two acts are interrelated and must be considered, as the relator contends, in the light of their common purpose; that is, the only purpose of the bond act is to provide the funds with which to carry out the purpose of the relief act. One act provides the administrative machinery for relief, and the other makes provision for financing the relief.

The bond act, chapter 65, Laws of 1933, p. 336, is entitled:

"AN ACT to relieve the people of the state from hardships and suffering caused by unemployment, through the agency of the emergency relief administration, . . ."

Section 1 of the bond act recites, as follows, the reasons for the enactment:

"World-wide economic depression has brought about unemployment of and distress to the citizens of the state. Their savings and reserves are becoming depleted. Hunger marches. Discontent, social unrest and incipient insurrection exist. Acts of insurrection are occurring. The moral resistance of the people is lessening. Government itself is imperiled and must be protected and preserved. Sovereignty implies sacrifice and imposes duty. It looks only to the perpetuity of our institutions as defined in our constitutions and in the hearts of men. It measures in terms of peace, good order and the common good. A critical emergency calling for constructive action is presented; otherwise catastrophe impends. Pauperizing relief is unsatis-

factory and inadequate. It is imperative that existing unemployment and distress be in some measure allayed. The citizenry of the state must have opportunity for self support. So, only, is democracy safe. This obligation is upon the state. Legislation is essential for its fulfillment." Rem. 1933 Sup., § 9992-35.

Section 2, p. 337, Rem. 1933 Sup., § 9992-36, authorizes the creation of a state debt and the issuance and sale of bonds in the sum of ten million dollars "to carry out the purposes and provisions" of chapter 8, Laws of 1933. The purpose, as we stated above, of the relief act (chapter 8, Laws of 1933, p. 103) was to relieve citizens suffering from hunger and lack of clothing and shelter; and that purpose, the relief act provided, was to be achieved by "work relief" and/or "home relief." Section 3 of the bond act (chapter 65, Laws of 1933, p. 338) provides that the proceeds from the sale of the bonds shall be deposited to the credit of the state emergency relief fund created by § 31, chapter 8, Laws of 1933, p. 118, *"and shall be used to carry out the purposes and provisions"* of *chapter 8, Laws of 1933;* and that, "for the purpose of paying expenses incurred under and carrying out the purposes and provisions" of chapter 8, Laws of 1933, "there is hereby appropriated from the state emergency relief fund *for construction work for unemployment relief* the sum of ten million dollars." (Italics ours.)

We said in *State ex rel. Hamilton v. Martin,* 173 Wash. 249, 23 P. (2d) 1:

"The relief act, which is interrelated with and referred to in the bond act, has for its purposes, as determined from its title, first, to relieve the people of the state from hardships and suffering caused by unemployment, which is identical with one of the objects sought to be obtained by the enactment of the bond act. The relief act further creates what it terms an

emergency relief administration and defines its duties;"

and held that the bond issue was valid, without popular submission and approval, within the meaning of § 2, Article VIII of our Constitution; that the legislative declaration of the facts (state-wide unemployment and poverty) constituting the emergency was conclusive. In other words, the appropriation of the proceeds from the sale of the bonds to relieve citizens who were suffering from hunger and lack of clothing was not a charitable appropriation any more than an appropriation made to repel an invasion; that the obvious aims of the combined legislation (chapters 8 and 65) were to prevent insurrection by civilized methods rather than by violence; that the bond act and the relief act were interrelated, and that the common purpose was to relieve citizens suffering from hunger and lack of clothing and shelter, either through a program of public construction or by supplying directly, to those in need, shelter, fuel, food, clothing, etc., defined by § 2, chapter 8, Laws of 1933, p. 104, as home relief.

Chapter 8 of the Laws of 1933 provides for both work relief and direct, or home, relief. Both are clearly defined. The relief act and the bond act were intended to relieve the same situation. The two acts are *in pari materia,* and must be read and construed together. Each act should be considered in the light of the other as if they constituted but one act. Being construed together as one act, all parts of the two statutes are to be construed together and harmonized in order that the legislative intent be ascertained. 25 R. C. L. 1006.

To give the effect to the words "for construction work for unemployment relief" contended for by respondent, would destroy the meaning of the entire context. Such construction would be repugnant to the two statutes, which are to be considered together as

one general enactment, and destructive of the obvious intent of the legislature. It would be a clear violation of § 28, chapter 8, Laws of 1933, p. 117, providing for liberal construction.

That the legislature contemplated payments by the state to the county welfare boards for both work and home relief is obvious. The phrase "work and/or home relief" appears many times throughout the relief act. State aid is defined as "payments to a county welfare board by the state for work relief and/or home relief or to a county or city for work relief." Manifestly, the purpose of the two acts is not construction work, but relief; and, if relief can not be afforded through a program of construction, payments may be made to a county welfare board in order that direct, or home, relief may be furnished.

The writ is granted.

BEALS, C. J., MAIN, BLAKE, and HOLCOMB, JJ., concur.

STEINERT, J. (dissenting)—Stripped of its statutory quotation and reference, and aside from the deductive processes employed in reaching its conclusion, the holding of the majority opinion is, tersely stated, simply this: Although the legislature has specifically appropriated the sum of ten million dollars, or so much thereof as may be necessary, from a particular fund, to be devoted to *construction work* for unemployment relief, nevertheless the various county welfare boards, by their respective vouchers drawn on the state auditor, may divert substantial portions of the money so appropriated and compel expenditure thereof for relief administered by such welfare boards in the form of shelter, fuel, food, clothing, etc. I am wholly unable to follow the reasoning or to accept the conclusion of the majority, and am therefore compelled to register an emphatic dissent.

In order that my view of the matter may be clearly understood, it is necessary to restate much of what has been covered in the majority opinion, but in a somewhat more narrative and general form.

In January, 1933, when the last legislature of this state was called in session, there existed throughout the world an economic depression of such magnitude and gravity as to call for immediate and the most serious consideration. Any present expression attempting to describe the condition then existing would be commonplace and is now wholly unnecessary. Everybody knew of it, either by personal experience or else by the most casual observation. The legislature fully recognized the situation, and at once set about to meet and alleviate the conditions obtaining throughout the state. Within ten days after the session had opened, the legislature passed an act entitled:

"AN ACT to relieve the people of the state from hardships and suffering caused by unemployment; . . ." Chap. 8, Laws of 1933, p. 103.

The act had for its specific purpose the creation of the necessary machinery for providing and administering relief in *all* its forms. A state board, denominated the "State Emergency Relief Administration," was created, and was given supervision of all phases of the plan devised. The board was authorized and directed (1) to make a thorough and comprehensive study and survey of unemployment within the state; (2) to determine the extent and nature of public work required or useful to be done by the state and its political subdivisions, and (3) to ascertain the amount of resources made available by public appropriations or private contributions for the relief of unemployed persons in the state. The board was vested with full authority to supervise the administration of all unemployment relief within the state's borders.

At the same time, the act created county welfare boards and made them responsible for the administration and supervision of "work and home relief" within the respective counties. "Work relief" was defined as meaning wages paid by municipal corporations to unemployed persons for services rendered by them to the municipalities. "Home relief" was defined as "shelter, fuel, food, clothing, water, light, necessary household supplies, medicine, medical supplies and medical attendance furnished to persons or their dependents . . ." For the purpose of carrying out the provisions of the act, a "State Emergency Relief Fund" was created, and *to* it was appropriated *from* the state's general fund the sum of twenty thousand dollars. This appropriation will be referred to again a little later.

With the passage of the above act, the machinery for providing relief was created, but that was all. A general plan of campaign had been broadly outlined, but the sinews of war had not been supplied. The legislature had made a start, but it was only the beginning. The end had been dimly visualized, but the methods of accomplishment had not yet been perfected. The specific plan of operation or attack was still in its chrysalis. A question of serious import was in the background. Should relief, in its major aspects, take the form of aid through employment, or should it approximate a dole system? Should the public be compensated, in part, for the money it supplied, or should it indulge in an extravaganza of charity? Public opinion was a ready reference and a safe guide. The public was deeply concerned and vitally affected and, moreover, it was willing to be consulted. Public opinion expressed itself by word of mouth and through the press. The legislature heard, considered, and

acted. On March 1, 1933, it passed chapter 65, Laws of 1933, p. 336, entitled:

"An Act to relieve the people of the state from hardships and suffering caused by unemployment, . . . ."

Its lugubrious preamble concluded as follows:

"A critical emergency calling for constructive action is presented; otherwise catastrophe impends. Pauperizing relief is unsatisfactory and inadequate. It is imperative that existing unemployment and distress be in some measure allayed. The citizenry of the state must have opportunity for self support. So, only, is democracy safe. This obligation is upon the state. Legislation is essential for its fulfillment." Laws of 1933, p. 336, § 1, Rem. 1933 Sup., § 9992-35.

Paraphrasing and analyzing this language, it is apparent that something had to be done, and done at once: A commonwealth of paupers, or a commonwealth having the instincts of paupers, would be fatal to democracy; the self-respect of the individual must be retained; self-respect inheres in, and is the outgrowth of, decent and adequate employment; self-support, not support by others, is the need and the demand; given a self-supporting, self-respecting citizenry, the state is safe, otherwise it is lost; it is the duty of the state, through legislation, to provide, for the time being, that which is necessary to its own survival, namely, employment for its people. Such was the conclusion of the legislature after full deliberation following the expression of public opinion.

Chapter 65, Laws of 1933, p. 336, to which we have just been referring, is short and to the point. It contains but seven sections, of which the last is an emergency clause. Section 1 contains the preamble, to which we have already alluded. Five of its sections deal (1) with the creation of a ten million dollar debt,

for which bonds were to be issued; (2) with temporary loans in anticipation of the sale of such bonds, and (3) with methods for the payment of the principal and interest of the bonds. Section 3 is the heart of the act, so far as we are here concerned. It reads as follows:

"The moneys arising from the sale of each issue of bonds under this act shall be deposited in the state treasury to the credit of the special fund created by section 31 of chapter 8, Laws of 1933, known as the 'State Emergency Relief Fund,' and shall be used to carry out the purposes and provisions of said act. For the purpose of paying expenses incurred under and carrying out the purposes and provisions of said act, *there is hereby appropriated from the state emergency relief fund for construction work for unemployment relief the sum of ten million dollars ($10,000-000.00) or so much thereof as shall be necessary.*" (Italics mine.) Rem. 1933 Sup., § 9992-37.

In short, this section provides that the proceeds of the sale of the bonds shall be paid *into* the emergency relief fund, and immediately *appropriates therefrom* the entire amount *for construction work for unemployment relief*. Can language be any plainer than this? A single reading is sufficient to enable one to understand what it means. A second, third or more frequent reading only emphasizes its meaning. The whole amount is appropriated and devoted to construction work to the end that unemployment may be relieved. If ever the legislature made its purpose and intent clear and plain in any statute, it did so in the use of this language. Not a word that it used in making the appropriation is superfluous, nor can a word be added except to change its obvious meaning or to render it ambiguous.

Nor was the conclusion of the legislature arrived at without travail. Even after public opinion had expressed itself, the members of the legislature were still

divided upon the question as to how the ten million dollars should be spent. The history of this particular legislation throws a calcium light upon the intention of the legislature as finally expressed, and leaves no doubt as to what that body meant to do. Chapter 65, Laws of 1933, p. 336, was introduced as House Bill No. 263. Section 3 of that bill was identical with § 3 of chapter 65, except that the words "for construction work for unemployment relief" were inserted by way of amendment after the bill was originally introduced. House Journal, pp. 384 and 386.

Under the bill as originally introduced, the appropriation was as broad and as comprehensive as it could possibly have been made. Its limits were coextensive with the limits of the parent act, chapter 8, Laws of 1933, p. 103, which merely provided the machinery for the administration of relief. Under the original bill, the administrative officers would have had the widest discretion as to the application and expenditure of the proceeds of the bond issue. The insertion of the words "for construction work for unemployment relief" were, therefore, restrictive upon the original provisions of the bill, and limited the purposes for which the money could be expended. Without any reference at all to the history of the legislation, the meaning of the act as it stands is clear and obvious; subjected to the light of its antecedent history, its meaning is indubitable. That the history of an act may be resorted to in aid of its interpretation is well settled. *Stovall v. Toppenish School District No. 49,* 110 Wash. 97, 188 Pac. 12, 9 A. L. R. 908; *State ex rel. Fair v. Hamilton,* 92 Wash. 347, 159 Pac. 379; *State ex rel. Griffin v. Superior Court,* 70 Wash. 545, 127 Pac. 120; *Scouten v. Whatcom,* 33 Wash. 273, 74 Pac. 389; *Howlett v. Cheetham,* 17 Wash. 626, 50 Pac. 522.

In the process of formulating the program and scope

of chapter 65, Laws of 1933, p. 336, the legislature was exercising its discretionary powers. The amount of the bonds and the use to which their proceeds were to be put were vital and paramount questions for consideration. As to the amount, the legislature might have fixed it at one million, ten million, or fifty million dollars. As to the method of administering and expending the funds, the legislature might have appropriated the entire amount to "home relief," to "work relief" or proportionately to both; or it might have appropriated the entire amount to such use as the administration in its discretion should determine. As to these various amounts and methods, the legislature had and exercised its choice.

The conclusion at which it arrived is patent and unmistakable. It determined that, so far as the relief to be granted by the act was concerned, it was to be in the form of *work* relief; it further determined that the program of public work would, so far as it could then be ascertained, entail the expenditure of approximately ten million dollars. Accordingly, that amount of indebtedness was authorized, and the proceeds to be realized therefrom were exhausted in a single appropriation for construction work. And that, to my mind, is all that there is to it.

But I shall go a step further. I have already referred to the fact that, in the parent act, chapter 8, Laws of 1933, p. 103, which set up the machinery for administering relief, the sum of twenty thousand dollars was appropriated from the state's general fund to the state emergency relief fund. Following the passage of that act, the legislature subsequently passed chapter 46, Laws of 1933, p. 275, appropriating that same sum out of the special fund to enable the relief commission to carry out the provisions of the

parent act. In this connection, it is to be noted that chapter 46, the appropriating act, placed no restriction whatever upon the *kind* of relief that was to be administered in the use of the twenty thousand dollars. It might be either "home relief" or "work relief." The absence of any restriction in chapter 46 accentuates the restrictive feature set forth in chapter 65, with which we are here concerned.

It is contended by counsel that the phrase "for construction work for unemployment relief" should be supplemented by inserting the word *and* between the words "work" and "for," so that the phrase should read "for construction work *and* for unemployment relief." In making appropriations, the legislature is enjoined, by § 4, Art. VIII of the constitution, as follows:

"No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; . . . and every such law making a new appropriation, or continuing or reviving an appropriation, *shall distinctly specify the sum appropriated, and the object to which it is to be applied,* . . ." (Italics mine.)

In enacting chapter 65, Laws of 1933, the legislature followed the mandate of the constitution literally. To insert the word *and* in the phrase "for construction work for unemployment relief," as suggested by counsel, is unwarranted, for two reasons: (1) because it would change entirely the meaning of the statute, already clearly expressed; (2) because it would authorize the expenditure of a portion of the money for such construction work as had no connection with unemployment relief at all. That certainly was not the intention of the legislature. Courts may not supply words purposely omitted from a statute, nor will words

be added unless it is necessary to do so in order to make the statute conform to the obvious intent of the legislature or to prevent the act from being absurd. *Eldridge v. Bellingham,* 106 Wash. 96, 179 Pac. 109; 59 C. J. 992; 25 R. C. L. p. 973, § 225.

If it be the purpose of this court in this, or any other, case to rewrite a statute or to attempt to dictate the policy that the legislature should pursue, it would be a simple matter in any instance to accomplish that result by the deletion or the addition of certain words. But if it be, as it should be, the purpose of the court to declare the law as it is written, then there can be no escape from the conclusion that, when the legislature appropriated ten million dollars "for construction work for unemployment relief," it said what it meant, and meant what it said.

I therefore dissent.

MITCHELL and TOLMAN, JJ., concur with STEINERT, J. GERAGHTY, J., took no part.