[Civil No. 3743. Filed March 25, 1936.]

[56 Pac. (2d) 628.]

PEARL L. PRIDEAUX, Plaintiff, v. ANA FROH-MILLER, as Auditor of the State of Arizona, Defendant.

348

Mr. Emmet M. Barry, for Plaintiff.

Mrs. Ana Frohmiller, Defendant, *in pro. per.*

ROSS, J.—This is an original proceeding in *mandamus* against Ana Frohmiller, as state auditor. It seeks to compel the auditor to audit, allow, and draw a warrant for a claim of $6 for services rendered by plaintiff, Prideaux, to the state tax commission in the preparation of a defense to a suit in the United States District Court for Arizona by the United Verde Copper Company against said commission, involving the company's tax assessments for the year 1933; also a claim for $6 for like services in preparation of a defense to a suit by the Verde Tunnel & Smelter Railroad Company against said commission, involving the company's tax assessment for the year 1935.

The complaint sets out that the debt owing to plaintiff was incurred by the state tax commission under and by virtue of an authorization of the Governor of the state, issued and proclaimed on January 31, 1936, pursuant to the provisions of chapter 61, Laws 1931, and section 2620, Revised Code of 1928, the latter being a part of the state Financial Code.

It appears from the complaint and the Governor's proclamation that, in addition to the two above-named suits, there are pending in the same court, four suits by the Phelps-Dodge Company, contesting its assessments for the year 1935; two by the Central Arizona Light & Power Company (one for 1933 and one for 1934); one by the Verde Tunnel & Smelter Railroad Company, contesting its assessment for the year 1935; one by the United Verde Copper Company, contesting its assessment for the year 1934; and two by the Valley Bank & Trust Company contesting its assessments for the years 1934 and 1935.

The Governor's authorization to the tax commission to incur debts to defend tax assessment suits extends to those brought against the tax commission before the time the Twelfth Legislature met (January 14, 1935), as well as those instituted after the adjournment of the legislature.

It appears from the complaint that there remains in the state treasury to the credit of the Governor's general fund a balance of $400 of the $10,000 that the Twelfth Legislature appropriated ''for the prosecution, defense or settlement of pending tax litigations'' (subdivision 33, § 1, chap. 107, Laws 1935), and that such sum is all that is available for the defense of the several suits; that the tax assessments are contested on the ground that the contestants' properties are assessed at more than their value while other taxpayers' properties are assessed at only 60 per cent. of their value; and that such sum ($400) is wholly inadequate to gather and prepare the necessary evidence and present the same in the trial of said cases, or any one of them.

The Governor's authorization was to incur debts and liabilities in the sum of $15,000, or so much thereof as is necessary, for the defense of the several suits named above, to be paid, as other claims against the state, from the general fund. It is alleged in the complaint that there is, and was at all times, an unexpended balance of $15,000 in the fund against which the claims of this plaintiff are chargeable, and this stands undisputed; also that such claims were approved by the chairman of the state tax commission.

The defendant has filed a general demurrer to the complaint and contends it should be sustained for the reason that the appropriation in chapter 61, *supra,* out of the general fund is invalid because no maximum limit is fixed therein.

The object and purpose of the proceeding is to have determined whether the tax commission, as the body constituted by the legislature to supervise the assessment of property for taxes, shall be supplied with money with which to prepare a defense to the suits brought by the above taxpayers. It appears from the complaint that the taxes involved amount to approximately $4,000,000, and it can thus be seen that the litigation is of considerable magnitude and of great interest to the state government and · to the other taxpayers of the state who had paid their taxes. It is also seen that the nature of the question involved will necessitate an outlay of considerable sums of money for witnesses and other expenses incident to a trial or trials.

To determine the question involved, it will be necessary that we construe section 2620, *supra*, and chapter 61, *supra*, and we therefore set them out at this place.

"§ 2620. *Balances to be used as emergency fund; such fund defined; method of expending.* All balances in the general fund, after distributing the credits therein for the purposes and as provided by law, shall be set aside and be available as an emergency fund for state purposes, to the amount necessary to meet contingencies and emergencies arising from invasions, riots or insurrections, epidemics of disease, acts of God resulting in damage or disaster to the works, buildings or property of the state or which menace the health, lives or property of any considerable number of persons in any community of the state, and for which no other funds are appropriated, or for which the appropriation was insufficient to meet the emergency. The governor may authorize the incurring of liabilities and expenses to be paid as other claims against the state, from the general fund, when the emergency fund is sufficient for that purpose. In such contingency or emergency, the governor may authorize the incurring of debts against the state, to the amount necessitated thereby, in ex-

cess of the amount of such emergency fund, provided, the aggregate amount of the debt so incurred and the then existing debts of the state, direct or contingent, shall not exceed the sum of three hundred fifty thousand dollars.''

Chapter 61 reads:

''Section 1. In addition to the powers granted to the governor under Section 2620, Revised Code, 1928, the governor when requested by the tax commission and the attorney general, for the purpose of providing funds to defend suits brought against the tax commission contesting tax assessments, may authorize the tax commission to incur debts and liabilities against the state to be paid as other claims against the state from the general fund.''

It will be noticed that section 2620 (1) creates an emergency fund and defines it. It comes out of the state general fund and is made up of balances therein after distributing to all the officers, departments and state agencies their proportion of such fund as fixed in the biennial appropriation act. (2) This emergency fund is available in ''the amount necessary to meet contingencies and emergencies arising from invasions, riots or insurrections, epidemic of disease, acts of God,'' etc., for which no other funds have been appropriated or for which the appropriation was insufficient to meet the emergency. (3) Before the emergency fund may be used, the Governor must authorize the incurring of the liabilities and expenses, which implies that he must determine the existence of a contingency or emergency of the kind enumerated in section 2620. After such determination, two ways are provided for financing the contingency or emergency: (a) If the emergency fund is sufficient for such purpose, the expense is ''to be paid as other claims against the state from the general fund''; (b) if the expense of caring for the contingency or emergency

is in excess of the emergency fund, the Governor may authorize the incurring of debts against the state to the amount necessitated thereby, 'which, however, may not exceed together with the existing debts of the state $350,000, the highest amount under the Constitution the state may become obligated for. Section 5, article 9.

The authority conferred by the legislature on the Governor, to incur debts and liabilities against the state under certain circumstances, is to be exercised only upon a state of facts defined by the law-making body, and if the facts, thus made a condition to the exercise of the authority, exist, there can be no question about the validity of the law.

Legislation conferring authority on an executive officer to authorize the incurrence of debts payable out of a fund created to meet emergencies is recognized and approved by the courts of California. *Heron* v. *Riley,* 209 Cal. 507, 289 Pac. 160; *Vandegrift* v. *Riley,* 220 Cal. 340, 30 Pac. (2d) 516.

Whether an emergency or contingency exists authorizing the Governor to incur debts against the emergency fund under section 2620 is a question of fact, the ascertainment of which naturally devolves upon the Governor. The exercise of his discretion upon the facts should not be disturbed by the courts unless for a lack of power or an abuse of discretion. *Vandegrift* v. *Riley, supra.*

The Financial Code was passed by the legislature at its Special Session in 1922, as chapter 35. Section 2620, *supra,* is an effort, and we think a successful effort, by the codifier to restate, without changing its meaning, section 10 of said chapter 35. We here set out for clarity so much of section 10 as defines ''contingencies'' and ''emergencies'' and ''emergency fund'':

"All balances, which may be available in the General Fund, after distributing the credits therein for the purposes and in the manner provided by law, shall be for use as credits to an emergency fund for State purposes, to the amount which may be necessary to meet contingencies and emergencies as defined in this Section. In the event of invasions, riots or insurrections, epidemics of disease, acts of God which result in invasion, damage or disaster to the works, buildings or property of the State, or, which menace the health, lives or property of any considerable number of persons in any community of the State, and confined to contingencies as to which no other funds are appropriated, or in the event, appropriations have been made for similar contingencies, then, confined to amounts which may be necessary in addition to such appropriation, to meet the emergency in each case, the Governor of the State may authorize the incurring of liabilities and expenses to be paid from the emergency fund created in this Section."

Under this provision, the existence of an emergency being established or admitted for which no appropriation by the legislature has been made, or, if made, has been insufficient, the Governor may authorize the incurring of liabilities and expenses, to be paid from the emergency fund created by section 2620 (section 10, chapter 35), *supra*. Where an appropriation has been made for one of the objects enumerated in section 2620 as an emergency, the Governor may incur debts against the emergency fund of the state to the same object when the legislative appropriation therefor is insufficient. If the emergency, or the asserted emergency, has not been acted upon by the legislature and appropriated for, it must in fact be an emergency of the kind named in section 2620, that is, an invasion or a riot or an insurrection or epidemic of disease or an act of God causing damage to state property or the health of the people, as stated in said

section, before the Governor is authorized to act; and if the legislature has had an opportunity to act and has rejected the object as an emergency, or has failed to approve it by appropriating therefor, or the facts fail to show it to be an emergency, the Governor may not incur debts in behalf of the object. *Le Febvre* v. *Callaghan,* 33 Ariz. 197, 263 Pac. 589.

Looking now to chapter 61, *supra,* it will be noted it consists of one section only and that it is tied into section 2620 and is supplemental thereto. "To the powers granted to the Governor under section 2620" is given (by said chapter 61) the power to authorize the tax commission, upon its request and that of the Attorney General, to incur debts and liabilities against the state for the purpose of providing funds to defend suits brought against the tax commission contesting tax assessments, to be paid as other claims against the state from the general fund.

We have tried to explain what powers are conferred on the Governor under section 2620, and we now say, whatever they are, chapter 61 adds one other power. It gives the Governor power to authorize, upon proper request, the tax commission to incur debts and liabilities to defend suits contesting tax assessments if the amount appropriated by the legislature for that purpose has proved insufficient, as well as in cases where no appropriation has been made by the legislature.

Suits contesting tax assessments are by chapter 61 made "emergencies." To authorize the Governor to act, it is only necessary that such a suit be filed and pending and that he be requested to incur the debts and liabilities by the tax commission and the Attorney General. No other fact or facts are essential to the exercise of his power. The named prerequisites to his jurisdiction are admitted.

■ We conclude that the debts involved were properly and authoritatively incurred, and that, if there is in the general fund of the state emergency funds sufficient to pay the claims, they should be approved and warrants drawn by the auditor on the treasurer therefor.

■ It is a fundamental rule of construction of statutes to assign to them, when they are susceptible of more meanings than one, a meaning that will not conflict with the organic law, especially when such construction will effect the evident purpose of the legislature. *Automatic Registering Machine Co., Inc.,* v. *Pima County,* 36 Ariz. 367, 285 Pac. 1034; *Gietz* v. *Webster,* 46 Ariz. 261, 50 Pac. (2d) 573. If we treat the directions in chapter 61 as being that the debts and liabilities incurred under the authority of the Governor shall be paid out of the general fund and not out of the emergency fund in the general fund, such provision would be unconstitutional because there is no maximum limit placed thereon. *Crane* v. *Frohmiller,* 45 Ariz. 490, 45 Pac. (2d) 955. But if the directions be construed as going to the emergency fund in the general fund, it would be from an appropriation limited to ''all balances in the general fund after distributing the credits therein for the purposes and as provided by law,'' and be valid and sustainable.

The two provisions of law, section 2620 and chapter 61, were indubitably intended by the legislature to be construed together, the latter being supplemental to the former. Section 2620 makes the debts and liabilities incurred under the Governor's authorization payable ''as other claims against the State, from the general fund, when the emergency fund is sufficient for that purpose''; and chapter 61, which by reference adopts the applicable provisions of section 2620,

makes the debts and liabilities incurred thereunder payable "as other claims against the State, from the general fund."

Under section 2622, Revised Code of 1928, the emergency fund is not "a special or specific fund" within the general fund, but an authorized credit, or an appropriation, to remain an unsegregated part of the general fund, to be applied to the purpose of the credit or appropriation. The incurrence of the debts here involved was to provide funds to defend suits contesting tax assessments, an emergent matter made so by the law itself, and it is but reasonable to assume the legislature intended by its language in chapter 61 to direct the payment of the expenses of the emergency out of the emergency fund in the general fund, if sufficient; and, thus construed, the directions in chapter 61 are constitutional and also consistent with the other provisions of the Financial Code. The appropriation found in section 2620 is ample authority to pay the expenses and debts of suits contesting tax assessments, and such appropriation is by reference a part of chapter 61 and for that reason the apparent conflict should be reconciled so as to uphold the law and carry out what clearly appears to be the legislative intent. As aptly said in *State* v. *Yelle,* 175 Wash. 33, 26 Pac. (2d) 622, 624:

"The two acts are *in pari materia* and must be read and construed together. Each act should be considered in the light of the other as if they constituted but one act. Being construed together as one act, all parts of the two statutes are to be construed together and harmonized in order that the legislative intent be ascertained. 25 R. C. L. 1006."

The legislature is the only arm of the state that has any right or power to appropriate public moneys of the state, and also with it lies the power to designate the subjects or objects for which it will per-

mit the expenditure of public moneys. It, and it alone, may select, define, and designate "emergencies" or "contingencies," and we know of no reason why it may not name and define suits against the tax commission contesting tax assessments as such, and confer upon the Governor power to authorize, when properly requested, the incurrence of debts and liabilities to defend such suits.

The Constitution confers upon the legislature the power to authorize that debts be contracted in situations such as are enumerated in section 2620 and chapter 61, *supra,* the language of the Constitution being:

"The State may contract debts to supply the casual deficits or failures in revenues, or to meet expenses *not otherwise provided for."* (Italics ours.) Section 5, art. 9.

Matters of political concern or matters affecting the general welfare of the people are peculiarly within the legislative discretion. This is especially so in matters of taxation and revenue. There is no restriction in the Constitution against the legislation here involved. On the contrary, we think the above provision confers upon the legislature the power to authorize the incurrence of debts and liabilities in defending suits brought against the tax commission contesting tax assessments, and to provide for their payment.

The legislature has not limited the power of the Governor to authorize debts and liabilities to suits contesting tax assessments arising subsequent to the legislative session, but expressly extends such power to suits when "the appropriation was insufficient to meet the emergency," so that plaintiff's claims—the one for services in suits in which the appropriation is

insufficient, and the one for which no appropriation has ever been made—are on the same footing.

What we have said here would at first blush seem to be an overruling of *Crane* v. *Frohmiller, supra,* but, as a matter of fact, it is not. In that case the provision in section 2620 limiting the amount of the appropriation for emergencies was not considered in connection with chapter 61. We held there that the appropriation in chapter 61 was unconstitutional and invalid because there was no limit on the maximum amount that might be incurred or expended. It appears now that we overlooked the fact that there is a limit on the amount that may be incurred and expended from the general fund for emergencies and contingencies on the Governor's authorization and that such limit is found in section 2620, *supra.*

█ Although it is alleged in plaintiff's complaint "That there is and was at all times a sufficient unexpended balance, towit, an unexpended balance of Fifteen Thousand ($15,000.00) Dollars in the fund against which this claim is chargeable," and although this allegation, under the law of pleading, is admitted by the defendant's general demurrer to be true, it occurs to us that such admission may possibly be erroneous. If there is not, as a matter of fact, an unexpended balance in the general fund available as an emergency fund, then the auditor was right in refusing to audit claims and draw warrants therefor. But if there is sufficient balance in such fund, she should audit claims and draw warrants therefor. As the Governor did not attempt in his proclamation to authorize the tax commission to incur debts and liabilities against the state "in excess of the amount of such emergency fund," the claims of plaintiff can be audited and allowed only if there are such funds.

The writ is made peremptory only on condition that there are funds with which to pay claims in the general fund of the state available for emergencies, as provided in section 2620, *supra*.

McALISTER, J., concurs.

LOCKWOOD, C. J., Dissenting.—On the 10th of October, 1910, the representatives of the people of Arizona assembled for the purpose of forming a Constitution for the new state which, it was expected, would shortly enter the Union, and the result of their labors was that instrument which is now the supreme law of this state, subject only to the provisions of the Federal Constitution. Among its provisions are the following:

"Art. III. The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others."

"Art. IV, sub-div. 2, sec. 20. The general appropriation bill shall embrace nothing but appropriations for the different departments of the State, for State institutions, for public schools, and for interest on the public debt. All other appropriations shall be made by separate bills, each embracing but one subject."

"Art. IX, sec. 3. The Legislature shall provide by law for an annual tax sufficient, with other sources of revenue, to defray the necessary ordinary expenses of the state for each fiscal year. . . .

"No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the tax, to which object only it shall be applied. . . . "

"Section 4. . . . Whenever the expenses of any fiscal year shall exceed the income, the Legislature may provide for levying a tax for the ensuing fiscal

year sufficient, with other sources of income, to pay the deficiency, as well as the estimated expenses of the ensuing fiscal year.''

''Section 5. The State may contract debts to supply the casual deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by virtue of one or more laws, or at different periods of time, shall never exceed the sum of three hundred and fifty thousand dollars; and the money arising from the creation of such debts shall be applied to the purpose for which it was obtained or to repay the debts so contracted, and to no other purpose. . . .

''No money shall be paid out of the State treasury, except in the manner provided by law.''

These provisions laid down certain definite and well-known principles of constitutional law which may be summarized as follows: The three departments of the state government are to be kept separate and are not to exercise any functions except those specifically given them by the Constitution. The legislature is the sole source of law; it is the only authority in the state which may authorize the payment of money out of the state treasury, and no money can be paid except in the manner provided by law. In order to defray the expenses of the state government, the legislature is required to levy a property tax which shall not exceed an amount sufficient, when taken into consideration with other sources of revenue, to pay the ordinary expenses of the state. The state is expected to regulate its expenditures on the ''pay as you go'' basis, and may not incur any indebtedness except for certain specific purposes, and then only to a very limited amount.

It has, therefore, always been accepted as axiomatic that money cannot be paid out of the state treasury except when an appropriation thereof is made by the

legislature, or by the Constitution itself, and that no tax can be levied except for the purpose of meeting an appropriation theretofore made, or to pay a deficit when the income of the state for a given year has fallen below the estimate made when the tax was levied to meet the appropriations for that year.

In pursuance of these constitutional requirements and limitations, the legislature has provided a method for levying the taxes necessary to meet the appropriations made by it. Without setting forth in detail the statutes on the subject, it may be summarized briefly as follows: *After* the legislature has made its appropriations, the state tax commission makes an estimate of the amount of revenue which may be reasonably expected to accrue to the state from sources other than the direct property tax, deducts that from the total of the appropriations made by the legislature, and then fixes a tax rate which, based upon the assessed property valuation of the state, will raise the difference. In so doing, the tax commission is limited to fixing a tax only sufficient, in its judgment, to make up that deficit, and may not attempt to raise an amount *in excess of the appropriations made by the legislature.*

In 1919 the legislature became very much dissatisfied with the manner in which the finances of the state were being conducted, and in chapter 61, Session Laws of that year, adopted what is commonly called the "State Budget Law," the principal portions of which were carried forward into the Revised Code of 1928, as article 1 of chapter 60 thereof (section 2607 et seq.). This provided, in substance, that the Governor should place before the legislature, at the beginning of its biennial regular session, a careful survey of the financial condition of the state showing, among other things, the balances and deficits of the

different funds of the state, the estimated revenues, and all proposed expenditures, including anything required to meet an emergency due to casual deficits in funds or sources of revenue, or other contingencies. The obvious purpose of this was to provide the legislature with an accurate knowledge of the financial condition of the state, so that it could make such appropriations as it deemed advisable, having before it information which would enable it to estimate how great a property tax would be necessary to make up the difference between the amount which it appropriated and the resources other than the property tax it had or would have, actual or estimated, to meet those appropriations. This was certainly a step in the right direction, but in 1922 it was discovered that it was insufficient, and the legislature of that year adopted chapter 35 of the Special Session of the Fifth Legislature, commonly referred to as the "State Financial Code," later carried forward in its more important provisions as article 2, chapter 60, of the Revised Code of 1928. The original Code bears internal evidence that some, at least, of the men who prepared it were thoroughly familiar with the general principles of public finance, the chaotic condition of the laws of Arizona in regard thereto, and of the constitutional limitations on the authority of the legislature to deal with the subjects of appropriation and taxation. In discussing those portions of the Financial Code affecting the present case, I shall refer to the sections of the Code of 1928, which are, in effect, but a consolidation and revision of the original Financial Code of 1922. Section 2615 divides all moneys paid into the state treasury into twenty funds, nineteen being special in their nature and designated by name, and the twentieth being the general fund. This general fund is defined by the section as follows:

"The general fund of the state shall consist of all moneys belonging to, or for the use of the state, *paid into the treasury thereof,* and not belonging to any special fund."

Section 2617 provides:

"No money belonging to, or for the use of the state, shall be expended or applied by any state agency except as appropriated, unless otherwise specifically authorized."

After fixing these general limitations upon the handling of the state finances, the legislature realized that sudden emergencies of specific character might arise when it was not in session, and which it could not have anticipated, and therefore set up a carefully limited manner in which certain classes of these emergencies might be met. This is found in section 2620, which reads as follows:

*"Balances to be used as emergency fund; such fund defined; method of expending.* All balances in the general fund, after distributing the credits therein for the purposes and as provided by law, shall be set aside and be available as an emergency fund for state purposes, to the amount necessary to meet contingencies and emergencies arising from invasions, riots or insurrections, epidemics of disease, acts of God resulting in damage or disaster to the works, buildings or property of the state or which menace the health, lives or property of any considerable number of persons in any community of the state, and for which no other funds are appropriated, or for which the appropriation was insufficient to meet the emergency. The governor may authorize the incurring of liabilities and expenses to be paid as other claims against the state, from the general fund, when the emergency fund is sufficient for that purpose. In such contingency or emergency, the governor may authorize the incurring of debts against the state, to the amount necessitated thereby, in excess of the amount of such emergency fund, provided, the aggregate amount of the debt so incurred and the then

existing debts of the state, direct or contingent, shall not exceed the sum of three hundred fifty thousand dollars.''

It is evident from the language of the section that the men who drew it were constitutional lawyers, knowing what was necessary to constitute an appropriation and the limitations upon the power, even of the legislature, to make one. The necessary ingredients of a valid appropriation may be defined as follows:

''The setting aside from the public revenue of a *certain sum of money* for a *specified object* in such manner that the executive officers of the government are *authorized to use that money,* and no more, for that object and no other.''

The essential elements of an appropriation, no matter in what form or language they may be set forth, are: (a) ''A certain sum''; (b) ''a specific object''; and (c) ''an authority to spend.'' Any law which contains all three of these elements is, and always must be, an appropriation of money, no matter what the language in which it is expressed. Any law which does not contain these three elements is not and cannot be a valid and legal appropriation. The first requisite of one is the limitation to a *certain sum.* This limitation may be made in two ways, one by stating specifically in the act the amount of the appropriation, and the other by directing the expenditure be made only from a *certain specified fund which itself is limited in amount.* The limitation in amount of the specified fund from which an appropriation, otherwise unlimited, is to be paid may be made either by the legislature fixing a limit on the fund itself, or by directing it to be replenished from a definite and limited source. Unless the amount to be spent is made certain by the legislature in one of

these ways, there can be no valid appropriation, although the object is certain and the authority to spend is given.

Recognizing these legal principles, the men who wrote the Financial Code, not wishing to limit the amount which might be spent for the emergencies set forth in section 2620, *supra,* to a specified number of dollars, followed the second method and set up a *special fund* called the "Emergency Fund" which was to be replenished from specially limited sources, to wit:

"All balances in the general fund, after distributing the credits therein for the purposes and as provided by law."

What is meant by "all balances" in the phrase just quoted? The word "balance" in the sense in which it obviously is used in section 2620, *supra,* is defined as "the excess on either side or the difference between the two sides of an account." Webster's New International Dictionary. It is plain from the language quoted hereinbefore and defining the general fund that it consists of *money in the treasury* and not an estimate, hope, or expectation of money which may some day come into the treasury. What then is a "balance" in that general fund? Appropriations are usually made by the legislature to be "paid out of the general fund." When then an appropriation of that nature is made, it is a charge against the general fund if, as, and when money comes into the fund in sufficient amount to pay it. All appropriations not made from special funds are, therefore, charges against the general fund as money is received therein, until such time as they have been fully paid. It seems, then, plain that there can be no balance in the general fund until all of the appropriations outstanding, which are to be paid therefrom, have been paid.

And the same is true even should we violate the express language of section 2615, and hold that the general fund means not *money in the treasury,* but the amount which it is *hoped* may eventually come into the treasury, for under our Constitution and statutes no tax may be levied to create an unassigned surplus in the treasury. It is only in case at the end of the fiscal year the receipts are greater than had been estimated, or the appropriations are greater than necessary to carry out the purposes for which they were made that there can be a balance in the general fund. It is clear, therefore, that unless there be a balance of cash in the general fund, after all charges against that fund have been paid at the end of the fiscal year and when it appears that the appropriations made were not all used for the purpose for which they were made, or else that the treasury receipts were greater than anticipated, there can be nothing available, by the provisions of section 2620, *supra,* as an emergency fund, whether such fund be called a special separate and segregated fund (as the section clearly implies) or a mere credit in the general fund, as the majority opinion indicates. And it is also clear that no such balance *does* now exist nor *can* exist. It is a notorious fact, of which this court should take judicial notice, that the state of Arizona for many years has not had a balance in its general fund. If it had, the treasurer of the state has long violated his duty by registering interest-bearing warrants against that fund, for if there was a true balance therein, it was his express and mandatory duty to pay those warrants on presentation instead of registering them.

The men who wrote section 2620, *supra,* did so at a time when there was, indeed, frequently a balance in the general fund, for the state was then paying

warrants as presented, but they were far-seeing and realized that the time might come when no such balance would exist and no emergency fund would be created. They therefore provided a method for meeting emergencies which might arise under such circumstances. They could not authorize the Governor to make an appropriation for money, even limited in amount, for that was solely within the power of the legislature. Nor could the legislature itself make an appropriation which was unlimited and authorize its expenditure by the Governor. They could, however, authorize the incurring by the Governor of a limited indebtedness against the state for specified purposes, and this is what they actually did in the. last sentence of section 2620, *supra*. Under that section, therefore, it was provided that *if there existed a balance in the general fund,* a special emergency fund was to be created, composed of that balance, and the Governor might, when any of the circumstances set forth in the section arose, use so much of that emergency fund as was necessary. If, on the other hand, through an excess of appropriations over actual receipts, no balance existed in the general fund, the Governor was authorized to incur an indebtedness, on behalf of the state, limited in amount, together with other indebtedness similarly incurred, to $350,000. But in such case the auditor is not permitted, much less directed, to issue a warrant therefor. Section 35, Revised Code of 1928, expressly provides what shall be done in regard to a legal indebtedness against the state, when no provision has been made by law to pay the same. The auditor, under such circumstances, is required to give a certificate of indebtedness to the claimant, and report the matter to the legislature, which it is presumed will at the proper time make an appropriation authoriz-

ing the payment of the claim. Such are the rights, and the *only* rights, given to the Governor by section 2620, *supra.*

But it is not contended by anyone that the expenditure involved herein is authorized directly by the provisions of section 2620, *supra,* for no reference is made therein to tax suits against the state as constituting an emergency. The claim admittedly rests solely upon chapter 61, Session Laws of 1931, which reads as follows:

"An act authorizing the governor to issue emergency proclamations to cover expenses of tax suits. . . .

"Section 1. In addition to the powers granted to the governor under Section 2620, Revised Code, 1928, the governor when requested by the tax commission and the attorney general, for the purpose of providing funds to defend suits brought against the tax commission contesting tax assessments, may authorize the tax commission to incur debts and liabilities against the state to be paid as other claims against the state from the general fund."

We may consider this section either as an *amendment* to section 2620, *supra,* or as an act *supplemental* thereto and *in pari materia* therewith. If it be held to be the first, it is clearly unconstitutional as violating the provisions of section 14, article 4, part 2, of the Constitution which reads as follows:

"No Act or section thereof shall be revised or amended by mere reference to the title of such Act, but the Act or section as amended shall be set forth and published at full length."

The reliance of the majority, apparently, is rather on the theory that its construction is to be *in pari materia.* This rule means that when two separate statutes on their face show that they refer to the same subject, they are to be construed together so as

to, if possible, give effect to both statutes. To this general statement, of course, no exception can be taken, for it is the universal rule. There are two things, however, which must not be overlooked. In the first place, one cannot take from one of the statutes a word, a phrase or a clause and *add* it to the other statute in order to give the latter life. That is, if statute A standing alone is void or ineffective on account of the omission of a necessary part, though it be *in pari materia* with statute B, we cannot take from statute B that portion which gives it effect and add it to statute A so that the latter may become effective also. All that we may do is, when a certain portion of statute A is ambiguous in its meaning, to presume that it means the same as a similar but unambiguous part of statute B. In the second place, it is only when the language of statute A is ambiguous and susceptible on its face of more than one construction that the rule may be used. If the language and meaning of statute A is definite and unambiguous on its face, we may not substitute therefor the language and meaning of statute B, merely because that in statute A renders the latter unconstitutional or ineffective. To apply the rule to the instant case, we may not, under the guise of following the canon of *pari materia*, lift from section 2620, *supra*, that language creating the emergency fund and authorizing payments therefrom to meet the emergencies set forth in section 2620 out of its context and *add it* to chapter 61, *supra*. Further, if the language "to incur debts and liabilities against the state to be paid as other claims against the state from the general fund" is plain, simple and unambiguous, we may not give it a meaning different from that which it bears upon its face, merely because such meaning is necessary in order to make chapter 61 effective. If it were not

for the fact that the obvious meaning of the language used in chapter 61 will make the act unconstitutional, no one would contend for a minute that it was ambiguous in the slightest degree. If the legislature had the power to make a general and unlimited appropriation from the general fund, such as chapter 61 on its face is, there could and would be no contention that the money should or would be paid, except from the general fund, in the same manner as any other appropriation. It is only because the plain and unambiguous language used by the legislature causes the act to fail as an appropriation that there is any attempt made to find some hidden and esoteric meaning in its language. It will, of course, be argued that the legislature could not have meant what it said, because if it did, it must have known the act would be unconstitutional, and it is not to be presumed that it would do a vain thing. It seems to me a much more reasonable interpretation of the action of the legislature is to hold, not that it deliberately went out of its way to use language which it did not mean, the only possible purpose for such conduct being a secret intent and desire to defeat the purpose of the act or else to determine whether we would be able and willing to draw from that language meaning different from that which it bore on its face, but rather that it *had no knowledge of the legal effect of its language,* and, therefore, said exactly what it meant. If we are to rewrite laws for the legislature in such manner as to make them constitutional, merely because it fails to realize the legal effect of what it has both said and meant, we are setting ourselves up as a third and superior house of the legislative branch of the government. Unless we violate every rule of statutory and constitutional construction for the mere sake of expediency, I see no escape from hold-

ing that chapter 61 is unconstitutional as an appropriation because of the fact that, by its plain, certain, and unambiguous language, it has removed from the act one of the essentials of a valid appropriation, to wit, ''a certain amount.''

But even if the majority construction of chapter 61, *supra,* be correct, there is still an insuperable objection to the payment of the claim in question. As I have stated before, there can be no issuance of a warrant, and, therefore, no payment of a claim under the provisions of section 2620, *supra,* unless there is a balance in the general fund, within the true meaning of that word, and we know judicially that there is not, and has not been for many years, any such balance. The question of whether an obligation fails under the first clause of section 2620, *supra,* and is to be paid from the emergency fund, or whether it comes under the second provision, of an indebtedness to be evidenced by certificates of indebtedness which are later paid through an appropriation of the legislature, must be determined by the situation as it existed *when the obligation is incurred,* and not by the situation as it may exist a month, a year, or a decade later. It may be contended that it is alleged in the petition for the alternative writ ''that there is and was at all times sufficient unexpended balance, to wit: an unexpended balance of fifteen thousand dollars in the fund against which this claim is chargeable to pay the whole thereof,'' and that this is not denied by the respondent. The issue before us is on a general demurrer, and a demurrer admits the allegations of the complaint only for the purposes of the demurrer. Even if we assume for that purpose only in the present case that there is money in the emergency fund, the only effect of such an assumption would be that the demurrer would be overruled, with leave to re-

spondent to answer on the merits, if she desired, and she most certainly would promptly answer by alleging that there is not and has not been any available balance in the treasury at any time so as to create an emergency fund from which the claim can be paid. It seems to me that it is straining the technical rule of pleading somewhat to hold that we are bound to assume a fact, even for the purpose of a demurrer, when we know judicially that it is not true. However this may be, it is obvious that the ultimate result, even on the theory adopted by the majority as to the construction of chapter 61, is bound to be the same. There is, as a matter of fact, no emergency fund now in existence, and certainly chapter 61, *supra,* by the wildest stretch of imagination, cannot be held to authorize the incurring of any indebtedness in the manner provided in section 2620, *supra,* and limited to $350,000, for there is not the slightest reference to that in the chapter.

There is a method provided by the Constitution of Arizona, found in the Constitutions of almost every one of the forty-eight states of the Union and that of our federal government, and used time without number to meet the precise situation which has arisen here, to wit, the necessity of spending more money for a legitimate expense of government than the legislature has provided. Under our Constitution, the Governor may, at the shortest notice, convene that body, which has the power to make appropriations for any constitutional purpose in unlimited amount. He may, in that call, limit its power to act to the particular question only which he desires to submit to it. If the necessity for the appropriation made in his emergency proclamation really exists, there is no reason why it should be in session more than twenty-four hours, if it does its duty, as we

must presume it will. The few thousand dollars which a special session of this nature will cost is, in my opinion, a cheap price to pay for the maintenance of correct and vital constitutional principles.

The role of a Jeremiah is always unpopular, frequently obnoxious, and, unfortunately, usually fails to convince those who are in need of the warning, but that does not relieve a public officer, who is sworn to do his duty according to the dictates of the law and his conscience, from protesting against a departure from sound constitutional and legal principles. The people of Arizona, when they adopted their Constitution, and by their votes in the past when amendments have been submitted to them, have shown clearly that they approve of the general principle of limitation of indebtedness and of the keeping of the financial activities of the state within the bounds provided by the Constitution and the laws adopted in pursuance thereof. It seems to me that of late years there has been a tendency to depart further and further from those sound principles. We have already whittled away a great deal of the protection given the state against indebtedness by section 5, article 9, of the Constitution, in our holding that while the state itself may not *directly* incur excess indebtedness, it may, through the incorporation of one of its agencies and the setting aside permanently of a certain portion of its revenues, do indirectly what it may not do directly. We have held that municipal corporations may, in like manner, evade the limitation of section 8 of article 9 of the Constitution, by the issuance of bonds for which the revenues of some of its properties are pledged, even though the effect may be to vastly increase the property tax of the municipality in the long run, so long as the principal of the bonds is not made a direct obligation to be paid out

of the property tax. We are now being asked to violate the plain language of two acts of the legislature and the general principles of statutory construction, and allow money to be paid out of the state treasury in violation of the Constitution, by assuming that the legislature did *not* intend what it has said in explicit and unambiguous language it *did* intend, merely to avoid a little inconvenience and a comparatively small expense. We will shortly be asked to hold that the constitutional provision that a tax can only be levied to meet an appropriation made by the legislature does not mean what it says, but that if the tax commission thinks, whether rightly or wrongly, that a greater amount than that appropriated by the legislature for a certain purpose is required, it may make a levy to suit its idea of what the appropriation should have been, and the treasurer is then required to pay it out because the object is the same as that for which the legislature has made the limited appropriation, and it has later appeared the appropriation is insufficient to fully achieve the objective. The next contention will doubtless be that because the legislature has imposed certain duties upon public officials, if they have through the reckless use of the appropriation for that purpose, or for any other reason, exceeded its amount before the end of the fiscal year, they may incur such other indebtedness as they think, in their wisdom, is best, and that the legislature will then be morally, even if not legally, bound to make a deficiency appropriation to meet this extra expense. In that case, legislatures need no longer spend any of their time worrying about the general appropriation bill. All they need to do is to ascertain how much the various administrative officers of the state thought it necessary to spend in the preceding biennium and to levy a tax

accordingly. The transition from the one instance to the other is easy and natural, and where are we to stop? *Facilis descensus Averno. Sed retro-* ! If the people of Arizona, through an amendment to their Constitution, desire to remove the restrictions which they have placed on their administrative and legislative officers, it is within their power to do so, but I think it ill becomes the courts of the state to usurp that function.

The alternative writ should be quashed.