WELLS v. CHILDERS, State Auditor, et al.

No. 32373. Dec. 22, 1945.

Rehearing Denied Jan. 29, 1946.

*165 P. 2d 371.*

Sid White, of Oklahoma City, for plaintiff.

Randell S. Cobb, Atty. Gen., of Oklahoma City, for defendants.

RILEY, J. This original action involves the validity of allocations made under the act construed in Wells v. Childers, 196 Okla. 339, 165 P. 2d 358. Therein was tested constitutionality of House Bill 518, Title 74, S.L. 1945, ch. 1, p. 376, and upon consideration of the attack in whole on the specific grounds mentioned, the appropriation, except as to section 3 (by its terms transferring $200,000 to the fund, not then necessary to be decided) was sustained with approval of the legislative "policy and purpose to protect the state, in the interim between its sessions, from evil effects due to contingencies or emergencies which might happen, and *which could not be provided against prior to their occurrence.*" It was said:

"The Legislature created the fund for a public purpose and defined its policy in caring for contingencies and emergencies *which were not foreseeable by it.*"

Therein the court reserved matters such as now presented, saying the court was not then "concerned with any specific allocation of said funds . . . whether or not the Governor, in making a particular allocation, has acted within the purview of the legislative act, or whether or not, in a particular instance,

the Governor's authority transcends constitutional restrictions." It was noted that the authority of allocation was "capable of easy abuse."

The present action presents alleged abuses in gubernatorial allocations, under eleven causes of action:

No. 1. Allocation of $1,317.50, to State Examiner and Inspector for extra help, to be used in audit of School Land Department, under contract (64 O.S. 1941 § 156, S. B. 233, S. L. 1945, p. 247). The Legislature, having the matter before it, did not provide an emergency to S. B. 181, S. L. 1945, p. 465, and the legislative appropriation was not available until July 25, 1945 (90 days after legislative adjournment, April 26, 1945). The allocation seeks to supply funds for the interim — to do that which the Legislature did not do.

Nos. 2 and 3. Allocations of $403.50, to State Fire Marshal, for salaries and expenses of two liquefied petroleum inspectors for 25 days from July 1, 1945, to July 25, 1945 (Title 52, O. S. 1941 § 422). By H. B. 507, S. L. 1945, p. 172, sec. 9, an appropriation was provided for the purpose, but it was not available until July 25, 1945. The allocations sought to supply funds for the interim —to do that which the Legislature did not do.

No. 4. Allocation of $1,142.93, to State Board of Public Affairs, for expenses and salaries of employees to maintain and improve Capitol and mansion grounds from July 1, 1945, to July 25, 1945. By S. B. 193, S. L. 1945, p. 468, an appropriation was made for the purpose, but it was not available until July 25, 1945. The allocations sought to supply funds for the iterim—to do that which the Legislature did not do.

No. 5. Allocation of $302.25, to State Insurance Commissioner, for salaries of three clerk-stenographers from July 1, 1945, to July 25, 1945. By S. B. 190, S. L. 1945, p. 467, an appropriation was provided for the purpose, but it was not available until July 25, 1945. The allocation sought to supply funds for the interim—to do that which the Legislature did not do.

No. 6. Allocation of $2,000 to Oklahoma Confederate Home, Ardmore, Oklahoma, to be used for continuance of operation (maintenance) from July 1, 1945, to July 25, 1945, after which the Oklahoma Confederate Home would cease to exist, being transformed into Southern Oklahoma Hospital, an auxiliary to the University Hospital. (72 O. S. 1941 §§ 181 et seq.). By S. B. 2, S. L. 1943, p. 304, a biennial appropriation was made for the purpose and funds were available to June 30, 1945. By H. B. 200, ch. 32, S. L. 1945, p. 338, the Southern Oklahoma Hospital was created and all property of the Oklahoma Confederate Home was transferred to it, as an auxiliary of the University Hospital. The Board of Regents of the University of Oklahoma was vested with control and management. 72 O.S. 1941 §§181 et seq. were repealed. However, the effective date of the act was not until July 25, 1945; while "maintenance cost" of the eleemosynary institution is provided as a contingency and emergency under item 8, sec. 5, Title 74, ch. 1, p. 377, S. L. 1945 (Governor's Contingency Fund) and while the allocation sought to supply funds for the interim, nevertheless the purpose is not one "arising" as a contingency or emergency subsequent to legislative adjournment. The Legislature had the matter before it and that which the Legislature elected not to do may not be done as a contingency or emergency "arising" subsequent to legislative adjournment.

No. 7. Allocation of $1,800. to State Board of Health for per diem and traveling expenses of its members. By H. B. 77, Title 63, ch. 1, S. L. 1945, p. 224, the State Board of Health was created. By section 1 it was provided "the members of such board shall receive as compensation . . . $10 per day . . . and their actual and necessary expenses while engaged in the performance of their official duties", limited to $100 per year. The board may be entitled to

its compensation under the rule stated in Riley v. Carter, 165 Okla. 262, 25 P. 2d 666; Edwards v. Carter, 167 Okla. 287, 29 P. 2d 610; Telle v. Carter, 170 Okla. 50, 39 P. 2d 134. If so, no contingency or emergency existed. Otherwise, the Legislature had the matter before it and elected not to provide an appropriation for the purpose. The matter does not present a contingency or emergency "arising" subsequent to legislative adjournment.

No. 8. Allocation of $810 to State Industrial Commission for employment of a reporter for six months from July 1, 1945, to December 31, 1945. S. B. 131, S. L. 1945, p. 416, effective July 25, 1945, authorized the State Industrial Commission to employ seven reporters, being one additional reporter to that previously authorized. However, by S. B. 9, S. L. 1945, p. 452, an appropriation was made for only six reporters. The allocation seeks to authorize employment of additional reporter for 25 days prior to the effective date of the act providing the employment (Shaw v. Grumbine, 137 Okla. 95, 278 P. 311) and to supplant the election of the Legislature not to appropriate for the position after the effective date of the act creating it. The matter was before the Legislature and it is not a contingency or emergency "arising" subsequent to legislative adjournment. It is urged that $67.50 of this allocation was paid on July 16, 1945, prior to commencement of action Wells v. Childers, 196 Okla. 339, 165 P. 2d 358. Pro tanto the cause of action is moot. That may not be prohibited which has already been done. Roper v. Bd. of Education, etc., 167 Okla. 382, 29 P. 2d 950. As to the balance allocated, the matter is not moot.

No. 9. Allocation of $100 to Secretary of State, for extra help from July 1, 1945, to July 25, 1945. By S. B. 189, S. L. 1945, p. 465, an appropriation was made for the purpose, but it was not available until July 25, 1945. The Legislature had the matter before it, did not provide an emergency to the appropriation. By the allocation it is sought to supply funds for the interim and to do

do that which the Legislature did not do. This is not a contingency or emergency "arising" subsequent to legislative adjournment.

Acts of the Legislature become effective 90 days after adjournment, art. 5, sec 58, Const., with exceptions enumerated (initiative, referendum, or general appropriation bill). By two-thirds vote of all members of each house, the Legislature is empowered to declare an emergency, in which event the act, when approved, becomes immediately effective. This is an extraordinary legislative power. It is not delegable. 59 C. J. 1143; State v. Williams (Ind.) 90 N. E. 754. The legislative omission to declare an emergency to any act indicates a legislative view of the lack of necessity.

No. 10. Allocation of $1,000 to Textbook Commission, for per diem and expenses. 70 O. S. 1941 § 971 et seq., as amended, S. L. 1945, p. 333, by section 4 created a textbook committee to be appointed by the Textbook Commission. The Textbook Commission and committee shall receive the same compensation and necessary expenses. Chapter 84, S. L. 1933, § 4, creates the Textbook Commission and by section 3, Id., the commission "shall receive, as the only compensation for their services, the sum of $7 per day while on duty, and actual traveling and living expenses incurred," etc., which shall not exceed $6 per day. No maximum amount as to per diem or expenses is stated. Therefore it is doubtful if an appropriation was made by the act or that the rule in Riley v. Carter, supra, and kindred cases, applies. By S. B. 40, Title 70, S. L. 1945, p. 333, it is apparent that the Legislature had the matter before it and elected not to provide an appropriation for the purpose. The matter is not a contingency or emergency "arising" subsequent to legislative adjournment.

No. 11. Allocation of $10,000 to House of Representatives of the Twentieth Legislature, to be used for expenses necessary for completion of House Jour-

nal. Title 73, O.S. 1941 § 72, provides for preparation of journals to be a legislative expense. The section purports to allow salary and expenses to legislative officers after adjournment, as a part of the expense. Dixon v. Shaw, 122 Okla. 211, 253 P. 500, 50 A. L. R. 1232. By H. B. 352, S. L. 1943, p. 287, an appropriation for the purpose was made. It is said to be exhausted. By S. B. 39, S. L. 1945, p. 419, the Legislature made an appropriation for the purpose. The appropriation by the legislative act was made available for "such special or regular session or sessions of the Oklahoma Legislature" and for like sessions of the ensuing Legislature. By the allocation it is sought to supplant and to supplement legislative appropriations. This is not a contingency or emergency "arising" subsequent to legislative adjournment.

The public interest is concerned as to expenditures from the funds allocated, or to be allocated, where no protest has been or may be made. The matter is *"publici juris"* and the law of the case may establish a rule and guide for allocations and expenditures from such funds.

By H. B. 518, S. L. 145, ch. 1, p. 376, sec. 5, authority was vested in the Governor to: "use and expend any and all of the monies" "to defray expenses *arising* by reason of contingencies or emergencies for which provision has not been made". The following contingencies and emergencies were enumerated:

1. Necessary repair or replacement of public buildings destroyed by fire, etc.

2. Emergencies resulting from increase in cost of food, clothing, etc., for the operation of any state penal, charitable, or eleemosynary institution.

3. Supplemental allocation to the Oklahoma State Regents for Higher Education for emergency needs of the institutions, etc.

4. Necessary maintenance of National Guard when released from Federal service.

5. Necessary augmentation of any appropriation for any state function which may be reduced by failure in the *revenues* provided to finance such appropriation.

6. Food, clothing, maintenance cost, etc., at penal or eleemosynary institutions of the state.

7. Repair and replacement of highways and bridges destroyed or damaged by floods.

The first, like the seventh enumeration, is extraordinary, arising by act of God, and comparable to extraordinary expenses stated in section 24, art. 10, Constitution, and therein limited "to repel invasion, suppress insurrection, or defend the State in war." Into this class may fall enumeration 4 (necessary maintenance of National Guard when released from Federal service)— if it be considered as an agency to suppress insurrection. Enumeration 2 (emergencies resulting from increased cost of food to penal institutions and the like) and 6 (food, clothing, maintenance costs, etc., of penal and eleemosynary institutions) may constitute emergencies or contingencies as falling within the rule of the Smartt case, Smartt v. Bd. of County Com'rs of Craig County, 67 Okla. 141 169 P. 1101, under which cost of feeding prisoners was considered as a forced charge against county, without sufficient funds appropriated. Nevertheless, to be payable out of this fund, the contingency or emergency must have been such as "arising" and not foreseeable by the Legislature. Under enumeration 2, only the *increase* in cost of food, clothing, maintenance may be allocated and paid, and it being the duty of the Legislature to provide support for penal and eleemosynary institutions (arts. 13 and 21, Const.), under enumeration 6 as construed, the Governor's Contingency Fund is limited by our previous construction to contingencies or emergencies not foreseeable by the Legislature.

As to enumeration 3 (supplemental allocation to Oklahoma State Board of

Higher Education), it would seem that the ordinary need was foreseeable by the Legislature and was provided for by an appropriation and as such it is not subject to be augmented as a contingency or emergency unless relating to expenditures required under catastrophes such as considered in Prideaux v. Frohmiller, 47 Ariz. 347, 56 P. 2d 628, relating to contingencies and emergencies arising from invasion, riots, or insurrections, epidemics of diseases, acts of God, etc. Therein it was said: "If the Legislature has had an opportunity to act and has rejected the object as an emergency, or has failed to approve it by appropriating therefor, or the facts fail to show it to be an emergency, the Governor may not . . ." make the allocation.

It was held, Prideaux v. Frohmiller, supra:

"The Legislature is the only arm of the state that has any right or power to appropriate public moneys of the state, and also with it lies the power to designate the subjects or objects for which it will permit the expenditure of public moneys. It and it alone may select, define, and designate 'emergencies' or 'contingencies'."

Such was the view expressed in our former opinion.

Consideration must be given to enumeration 8 of section 5, supra, by which the Governor is sought to be authorized to expend this appropriation for "any circumstance, condition or situation which, in the judgment of the Governor, requires the expenditure of money for the *extraordinary protection* of the state and for which expenditures specific appropriation has not been made; but not excluding any other contingencies or emergencies not specifically enumerated.

Allocations must fall within contingencies and emergencies specifically enumerated, to be constitutional, or must be of extraordinary protection to the state and for which appropriation has not been made by legislative appropriation. "*Extraordinary protection*

*of the State*" must be limited to the meaning well defined in law, by Constitution, statutes, and judicial decisions, i. e., "to repel invasion, suppress insurrection, or defend the State in war," sec. 24, art. 10, Const., or the like.

In State v. Davis, 113 Kan. 4, 213 P. 171, an extraordinary expense was distinguished from ordinary expense, such as incurred by the state for promotion of the general welfare. It was said to be that compelled by some unforeseen condition which is not regularly provided for by law, as floods, famine, fire, earthquake, pestilence, war, or other conditions that will compel the state to put forward its highest endeavor to protect the people, their property, liberty and lives.

In re Appropriations by General Assembly of Colorado, 13 Colo. 316, 22 P. 464, it was said:

". . . Appropriations and expenditures which may be made or authorized by the general assembly are of two general classes: First, ordinary, which include all kinds of appropriations and expenditures necessary and proper for the support of the government and its institutions in time of peace; second, extraordinary, or such as are necessary to suppress insurrection, defend the state, or assist in defending the United States in time of war."

Thus limited, no allocation of the character here involved may be authorized nor the funds thereof expended without liability to the "public officials whose duties embrace the auditing and paying out of such allocated funds". Wells v. Childers, supra.

It is noted that section 6 of the act, supra, provides procedure for allocation of the fund, and the section also provides:

"The Governor may also incur such obligations and expenses as he may deem necessary by reason of any contingency or emergency and claim for payment of any such expenses or obligations shall, when approved by the Governor, be payable out of said Governor's Contingency Fund in the manner as other claims."

And it is provided in the beginning of that section that:

"The Governor may allocate and authorize the expenditure of monies *as may in his discretion* be necessary to defray any necessary expenses resulting from any contingency or emergency to any state officer, board, department, institution or commission in defraying expenses resulting from any such contingency or emergency."

That discretion and those contingencies and emergencies must be restricted to those previously enumerated, defined, and construed. Provisions of the section do not authorize the Governor to create at will contingencies or emergencies for which the fund may be expended. Such unenumerated but gubernatorially created objects of expenditures would constitute an appropriation, a function exclusively legislative. as a matter of fundamental principle, the Legislature may not create any fund, designate it an appropriation, and delegate determination of the objects of expenditure to any executive or administrative officer at his discretion. So to do not only would violate the Constitution (art. 5, § 55), requiring the distinct specification of the object to which it may be applied; additionally, such legislative authority sought to be delegated would violate section 1, art. 4, Constitution, by which the government is divided into three separate and distinct departments and in which it is provided that neither shall exercise the powers properly belonging to either of the others.

Writ of injunction granted.

GIBSON, C. J., HURST, V. C. J., and BAYLESS and ARNOLD, JJ., concur. OSBORN, WELCH, CORN, and DAVISON, JJ., dissent.

OSBORN, J. (dissenting). "The letter killeth; but the spirit giveth life." (II. Cor. 3 ch., v. 6.)

A casual reading of the majority opinion herein discloses the applicability of the above quotation. To paraphrase: "When technicality comes in at the door, Justice flies out of the window." The majority opinion herein written by a strong and active dissenter to the majority opinion in the former case of Wells v. Childers, 196 Okla. 339, 165 P. 2d 358, is predicated upon a technical construction of isolated sentences and words contained in the former majority opinion, and in my opinion does violence to not only the prior majority opinion but also to the legislative act under consideration and the well recognized principles of law which should govern this judicial tribunal in its interpretations of the solemnly enacted laws of this state.

In addition to enumerating seven specific provisions relating to the use of said funds, the Legislature, by the eighth provision, declared:

"Any circumstance, condition, or situation which in the judgment of the Governor, requires the expenditure of money for the extraordinary protection of the State and for which specific appropriation has not been made; but not excluding any other contingencies or emergencies not specifically enumerated."

As pointed out in the former majority opinion, the sum appropriated, as compared with total appropriations, constitutes a very small percentage of the total. It would have been entirely permissible for the Legislature to make specific appropriations for each department or institution of the state, and to distinctly specify the uses for each item thereof, such as furniture, telephone and telegraph, transportation, stamps, etc., and to include an item of appropriation for miscellaneous expenses or "contingent expenses" not specifically enumerated. But the Legislature desired to place an additional safeguard against the expenditure of such unenumerated funds, and so it appropriated a sum to a special fund which could be used by the various departments or institutions only with the approval of the Governor, and when he had made a determination that the extraordinary protection of the state required such expenditure.

When the Governor has made a finding of the existence of such emergency

or contingency, the court will not disturb the same "unless for a lack of power or an abuse of discretion." Commonwealth ex rel. Meredith v. Johnson, Governor, 292 Ky. 288, 166 S. W. 2d 409; Vandergrift v. Riley, 220 Cal. 340, 30 P. 2d 516; Prideaux v. Frohmiller, 47 Ariz. 347, 56 P. 2d 628.

Since the majority opinion strikes down all of the allocations made by the Governor as set out, I shall not attempt to analyze all of the fallacies and technicalities as applied by the majority.

I cannot refrain, however, from calling attention to the allocation made by the Governor to care for the inmates of the Confederate Soldiers Home at Ardmore. These inmates, the youngest of which, according to the record before us, is more than 100 years of age, have been honored wards of the state, some of them for several years. The Legislature changed the institution to a hospital, and broadened the field from which its inmates might be received. But through an apparent oversight, the funds for their care might not be available for a period of 25 days after the beginning of the biennium. Did the Legislature intend that these disabled, honored, and respected citizens of the state should be dispossessed and thrown upon voluntary charity or left to fend for themselves in their feeble helplessness? Surely, they could have had no such base intention. It was entirely proper for the Governor, in recognition of the emergency and contingency, and in the extraordinary protection of the state, to allocate funds for their support during the interim in which the institution was being transformed into the purpose declared by the new legislative policy.

Courts will not declare a legislative act unconstitutional unless its unconstitutionality appears beyond a reasonable doubt. Not only does such unconstitutionality not appear certain, but the additional safeguard against the expenditure of public money, subject always to a review by this court for abuse of discretion, has a basis for com-

mendation. But in reviewing such action, courts should be scrupulously careful to refrain from arrogating to themselves the power of determination instead of yielding such power to the designated legislative agent.

The spirit of the former majority opinion is violated by the present opinion. I therefore respectfully dissent.

Mr. Justice WELCH and Mr. Justice DAVISON concur herein.

WELCH, J. (dissenting). The majority opinion seems to me to take a political question and recognize it as a question of law, and sufficient as a law question to govern decision of this case, that is, the question as to what the Legislature, at a past session, could or should have foreseen, or what was or was not "foreseeable" by the Legislature.

It is a well-settled rule of statutory construction that if a legislative act does not violate the Constitution and is valid, it is to be construed and applied in keeping with the intent and purposes of the Legislature. The majority recognizes that, of course, in the second paragraph of the syllabus.

However, in the third paragraph of the syllabus the majority states or definitely implies that it was the intent and purpose of the Legislature that no such allocations as are here considered should be properly made out of the Governor's Contingent Fund.

The majority opinion, being founded upon that premise, reaches a correct conclusion, if the legislative intent and purpose is properly interpreted by the majority opinion.

But when I read the legislative act and observe the eleven allocations here specifically considered, and note the specific purpose to be served by each of those eleven allocations, I cannot conclude that the legislative intent and purpose was to exclude these items from the character of expenditure purposes which could be paid out of the Governor's Contingency Fund.

Surely several of these allocations come properly within the intent and purpose of the Legislature as that intent and purpose is discernible from the legislative act itself.

Therefore, in my view, the majority opinion is wrong in the original premise of legislative intent and purpose on which the opinion is founded.

I think the majority opinion places a construction much too narrow upon the meaning of item numbered "2" in the enumerated eight items that are specifically included in the expenditure purposes for which the legislative act was passed. It is too strict a construction to say that only that added or extra portion of the costs of the items could be paid from this fund. It is the emergency or contingency arising that is to be met by this fund.

Webster defines "emergency" as "an unforeseen combination of circumstances which calls for immediate action." Contrary to that it is the thought of the majority opinion that the word "emergency" used in the legislative act referred only to circumstances or conditions which were absolutely "unforeseeable" or which could not have been foreseen by the Legislature. The stated designation of this fund as a "Contingent" fund demonstrates the legislative intent and purpose that it was to be used not only to make expenditures which would be necessary for those things which could not have been foreseen at all, but that also it was to be used for expenditure for those emergencies or contingencies in governmental affairs which might arise from causes unforeseen in fact or overlooked, or which might arise from unforeseen conditions, or accidental or incidental occurrences, condtions or situations. All that is disclosed by the definition of the words "contingent" and "contingency."

So I find the majority opinion to be in error again when it wrongfully limits the meaning of the emergencies and contingencies set out in the legislative act and intended by the Legislature.

Since this legislative act has been tested and found to be constitutional, it is my view that it should be interpreted by giving to the words therein used, their ordinary and well understood meaning, and that we should construe the same according to the manifest intent and purpose of the Legislature, and apply the act to the situations and conditions and definite needs intended to be provided for by the Legislature.

When so construed and applied, the legislative act, if properly made use of by the executive and administrative agencies of the government, may well become a very useful part of the laws of the state and serve definite and positive needs and obligations of the state.

It is to be observed that several of the purposes sought to be served by these eleven allocations refer to constitutional needs and obligations of the state, and that all of them are within the constitutional purposes of our state government. No one of them involves any expenditure for unlawful or unauthorized state purposes.

Some of the allocations here involved are questionable and should be dealt with separately and specifically, but I am convinced that the majority is in error in dealing with all of them as a whole and invalidating them for the reasons, and upon the principles of narrow construction, set out in the majority opinion.

As construed by the majority opinion the legislative act creating this contingency fund will serve some purpose in that it may be used to take care of such situations as could not possibly have been foreseen by the Legislature, if agreement may be had upon the very difficult question as to what the Legislature could or could not have been able to foresee. The ability of one session of the Legislature to foresee specific details of future need might materially differ from the ability of a past or future session.

It seems to me too difficult to fix a legal standard by which to measure that which the Legislature could or could not have foreseen.

· At every regular session of the Legislature every matter of state need or interest is necessarily before that body. And in retrospect, that which the Legislature ought to have foreseen or could have foreseen, or could not have foreseen, is almost universally a political question, to be so considered and de-bated. I cannot believe the Legislature intended to make such a question to become a question of law in testing these expenditures, nor that this court should do so.

I therefore dissent. Mr. Justice OSBORN and Mr. Justice DAVISON concur in these views.